IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2015 Term

_____

No. 14-0100

_____

**FILED**

**June 16, 2015**

released at 3:00 p.m.
RORY L. PERRY II, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

STATE OF WEST VIRGINIA EX REL. JOHN D. PERDUE,
Plaintiff Below, Petitioner

v.

NATIONWIDE LIFE INSURANCE COMPANY, ET AL.,
Defendants Below, Respondents

_____

Appeal from the Circuit Court of Putnam County
The Honorable Joseph C. Reeder, Judge
Civil Action Nos. 12-C-287, 12-C-288, 12-C-289, 12-C-290, 12-C-291, 12-C-292, 12-C-293, 12-C-294, 12-C-295, 12-C-296, 12-C-322, 12-C-323, 12-C-324, 12-C-325, 12-C-327, 12-C-328, 12-C-329, 12-C-331, 12-C-355, 12-C-356, 12-C-357, 12-C-358, 12-C-359, 12-C-360, 12-C-361, 12-C-362, 12-C-363, 12-C-364, 12-C-372, 12-C-373, 12-C-374, 12-C-376, 12-C-377, 12-C-378, 12-C-380, 12-C-381, 12-C-419, 12-C-420, 12-C-421, 12-C-422, 12-C-423, 12-C-424, 12-C-425, 12-C-426, 12-C-427, 12-C-429, 12-C-430, 12-C-431, 12-C-432, 12-C-433, 12-C-434, 12-C-435, 12-C-436, 12-C-437, 12-C-438, 12-C-440, 12-C-441, 12-C-442, 12-C-443, 12-C-444, 12-C-445, 12-C-446, 12-C-447

REVERSED AND REMANDED

_____

Submitted: April 8, 2015
Filed: June 16, 2015

Patrick Morrisey, Esq., Attorney General
Dan Greear, Esq., Chief Deputy Attorney General
Jennifer Greenlief, Esq., Assistant Attorney General
Office of the West Virginia Attorney General

John H. Tinney, Jr., Esq.
James K. Tinney, Esq.
John K. Cecil, Esq.
The Tinney Law Firm, PLLC
Charleston, West Virginia
Counsel for Respondents Nationwide Life

Charleston, West Virginia

Anthony J. Majestro, Esq.
Special Assistant Attorney General
Powell & Majestro, PLLC
Charleston, West Virginia

Timothy C. Bailey, Esq.
Special Assistant Attorney General
Bucci Bailey & Javins LC
Charleston, West Virginia

Margaret M. Murray, Esq., *Pro Hac Vice*
Murray & Murray CO., L.P.A.
Sandusky, Ohio
Counsel for Petitioner

Sandra B. Harrah, Esq.
Hill, Peterson, Carper, Bee & Deitzler, PLLC
Charleston, West Virginia

Robert P. Krenkowitz, Esq., *Pro Hac Vice*
Tucson, Arizona
Counsel for Amicus Curiae Xerox State &
Local Solutions, Inc., d/b/a Xerox Unclaimed
Property Clearinghouse

Jonathan R. Mani, Esq.
Mani Ellis & Layne, PLLC
Charleston, West Virginia

Lynden Lyman, Esq., *Pro Hac Vice*
Concord, Massachusetts
Counsel for Amicus Curiae National
Association of Unclaimed Property
Administrators

Insurance Company and Nationwide Life and
Annuity Insurance Company

Alexander Macia, Esq.
Spilman Thomas & Battle, PLLC
Charleston, West Virginia

Phillip E. Stano, Esq., *Pro Hac Vice*
Wilson G. Barmeyer, Esq., *Pro Hac Vice*
Brendan Ballard, Esq., *Pro Hac Vice*
Sutherland Asbill & Brennan LLP
Washington, DC
Counsel for Respondents New York Life
Insurance Company; Lincoln National Life
Insurance Company; Erie Family Life
Insurance Company; New York Life
Insurance and Annuity Corporation; The
Western and Southern Life Insurance
Company; Western-Southern Life Assurance
Company; Primerica Life Insurance
Company; Ohio National Life Assurance
Corporation; Provident Life & Accident
Insurance Company; Pacific Life Insurance
Company; Colonial Life & Accident
Insurance Company; American Family Life
Assurance Company of Columbus, GA; and
Lafayette Life Insurance Company

Terrence D. O'Hare, Esq., *Pro Hac Vice*
J. Scott Paul, Esq., *Pro Hac Vice*
McGrath North Mullin & Kratz PC LLO
Omaha, Nebraska
Counsel for Respondent Physicians Life
Insurance Company

Steuart H. Thomsen, Esq., *Pro Hac Vice*
Wilson G. Barmeyer, Esq., *Pro Hac Vice*
Sutherland Asbill & Brennan LLP
Washington, DC
Counsel for Respondents Farm Family Life
Insurance Company; Reliastar Life Insurance
Company; and Horace Mann Life Insurance

Company

John M. Aerni, Esq., *Pro Hac Vice*
Adam J. Kaiser, Esq., *Pro Hac Vice*
Winston & Strawn LLP
New York, New York
Counsel for Respondents Bankers Life &
Casualty Company and Colonial Penn Life
Insurance Company


Loren E. Hayes, Esq.
Spilman Thomas & Battle, PLLC
Charleston, West Virginia
Counsel for Respondent United of Omaha
Life Ins. Co.

Bruce M. Jacobs, Esq.
Spilman Thomas & Battle, PLLC
Charleston, West Virginia

Markham R. Leventhal, Esq., *Pro Hac Vice*
Irma Reboso Solares, Esq., *Pro Hac Vice*
Jorden Burt LLP
Miami, Florida
Counsel for Respondents Monumental Life
Insurance Company and Transamerica Life
Insurance Company


Angela D. Herdman, Esq.
Mary Jane Pickens, Esq.
Andrew S. Dornbos, Esq.
Spilman Thomas & Battle, PLLC
Charleston, West Virginia

Edwin G. Schallert, Esq., *Pro Hac Vice*
DeBevoise & Plimpton LLP
New York, New York
Counsel for Respondents Prudential
Insurance Company of America and Pruco
Life Insurance Company

Maeve O'Connor, Esq., *Pro Hac Vice*
DeBevoise & Plimpton LLP

New York, New York
Counsel for Respondents Teachers Insurance
& Annuity Association of America and
Principal Life Insurance Company


Timothy J. O'Driscoll, Esq., *Pro Hac Vice*
Drinker Biddle & Reath LLP
Philadelphia, Pennsylvania
Counsel for Respondent Gerber Life
Insurance Company

Jason P. Gosselin, Esq., *Pro Hac Vice*
Laura M. Zulick, Esq., *Pro Hac Vice*
Drinker Biddle & Reath LLP
Philadelphia, Pennsylvania
Counsel for Respondents Allstate Life
Insurance Company; Lincoln Benefit Life
Company; and Penn Mutual Life Insurance
Company


Douglas A. Scullion, Esq., *Pro Hac Vice*
Laura Leigh Geist, Esq., *Pro Hac Vice*
Dentons US LLP
San Francisco, California
Counsel for Respondent Lincoln Heritage
Life Insurance Company


Thomas F. A. Hetherington, Esq., *Pro Hac
Vice*
Blaire Bruns Johnson, Esq., *Pro Hac Vice*
Edison, McDowell & Hetherington LLP
Houston, Texas
Counsel for Respondent Boston Mutual Life
Insurance Company


Jeffrey M. Wakefield, Esq.
Danielle Waltz Swann, Esq.
Flaherty Sensabaugh Bonasso PLLC
Charleston, West Virginia
Counsel for Protective Life Ins. Co., West
Coast Life Ins. Co., Sun Life Assurance Co.

of Canada, Riversource Life Ins. Co.

Thomas J. Butler, Esq., *Pro Hac Vice*
Jeffrey M. Grantham, Esq., *Pro Hac Vice*
Maynard Cooper & Gale PC
Birmingham, Alabama
Counsel for Respondent Riversource Life
Insurance Co., and American General Life &
Accident Ins. Co.

Jeffrey M. Wakefield, Esq.
Danielle Waltz Swann, Esq.
Flaherty Sensabaugh Bonasso PLLC
Charleston, West Virginia

Jeffrey M. Grantham, Esq., *Pro Hac Vice*
Maynard Cooper & Gale PC
Birmingham, Alabama
Counsel for Respondent Sun Life Assurance
Company of Canada and Riversource Life
Ins. Co.

Katharine A. Weber, Esq. *Pro Hac Vice*
Maynard Cooper & Gale PC
Birmingham, Alabama
Counsel for Respondents Protective Life
Insurance Company and West Coast Life
Insurance Company

Jared M. Tully, Esq.
Frost Brown Todd LLC
Charleston, West Virginia
Counsel for Respondents Metropolitan Life
Insurance Company; Metlife Investors USA
Insurance Company; New England Life
Insurance Company; Liberty Life Insurance
Company; Metlife Insurance Company of
Connecticut; General American Life
Insurance Company; and The State Life
Insurance Company

Frank E. Simmerman, Jr., Esq.
Chad L. Taylor, Esq.
Simmerman Law Office, PLLC
Clarksburg, West Virginia
Counsel for Respondents Genworth Life and
Annuity Insurance Company; Combined
Insurance Company of America; Genworth
Life Insurance Company; and North
American Company for Life and Health
Insurance


Thomas J. Hurney, Jr., Esq.
Michael M. Fisher, Esq.
Jackson Kelly PLLC
Charleston, West Virginia


Stephen M. LaCagnin, Esq.
Seth P. Hayes, Esq.
Jackson Kelly PLLC
Charleston, West Virginia


Ellen M. Dunn, Esq., *Pro Hac Vice*
Sutherland Asbill & Brennan LLP
New York, New York
Counsel for Respondent AXA Equitable Life
Insurance Company


Lee Murray Hall, Esq.
Jenkins Fenstermaker, PLLC
Huntington, West Virginia
Counsel for Respondent Hartford Life and
Annuity Insurance Company


Ancil G. Ramey, Esq.
Steptoe & Johnson, PLLC
Huntington, West Virginia

William E. Galeota, Esq.
Steptoe & Johnson, PLLC
Morgantown, West Virginia
Counsel for Respondent Massachusetts
Mutual Life Insurance Company


Carrie Goodwin Fenwick, Esq.
Goodwin & Goodwin, LLP
Charleston, West Virginia
Counsel for Respondent Guardian Life
Insurance Company of America


Robert L. Massie, Esq.
Nelson Mullins Riley & Scarborough LLP
Huntington, West Virginia
Counsel for Respondent USAA Life
Insurance Company


JUSTICE BENJAMIN delivered the Opinion of the Court.

JUSTICE KETCHUM concurs and reserves the right to file a concurring opinion.

SYLLABUS BY THE COURT

1.      With respect to the presumptively abandoned proceeds of a life insurance policy, the plain language of section 2(e) of the West Virginia Uniform Unclaimed Property Act, West Virginia Code § 36-8-2(e) (1997), demonstrates the Legislature's intent to affirmatively separate the insurer's obligation to account for and pay those proceeds to the Treasurer from the filing of any claim for benefits required by the policy terms.  The insurer's obligation to account for and pay those proceeds is tied instead to the death of the insured (or the insured's attainment of the limiting age), maturing three years thereafter.


2.      The West Virginia Uniform Unclaimed Property Act imposes no specific duty on insurers to search the Department of Commerce's Death Master File or any comparable data source.  Rather, the Act simply requires insurers generally, as holders of property presumed abandoned, to account for and turn over that property to the Treasurer.

Benjamin, Justice:

The West Virginia State Treasurer, John D. Perdue, appeals the order entered by the Circuit Court of Putnam County on December 27, 2013, that dismissed with prejudice sixty-three complaints he filed separately against insurance companies doing business in West Virginia. The complaints alleged, inter alia, that the insurers have unlawfully retained life insurance proceeds unclaimed by State residents, in contravention of the West Virginia Uniform Unclaimed Property Act of 1997, W. Va. Code §§ 36-8-1 to -32 (the "Act"). The Act, according to the Treasurer, manifestly designates him the legal custodian of such proceeds. The circuit court adopted the contrary view that the insurers' obligations under the Act are defined not by its clear and unequivocal provisions, but instead by the contractual terms of the life insurance policies taken out by the insureds. Because the circuit court's interpretation failed to give force and effect to the plain meaning of the words used in the Act, thereby frustrating clear legislative intent, we reverse the dismissal order and remand these matters for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Act designates the Treasurer as its administrator. *See* W. Va. Code § 36-8-1(1) (1997). In his role as administrator, the Treasurer is entitled to take custody of property presumed to have been abandoned if, inter alia, the apparent owner's last known address is in West Virginia. *See id.* §§ 36-8-4, -4(1). An "apparent owner" under

the Act is "a person whose name appears on the records of a holder as the person entitled to property held, issued or owing by the holder." *Id.* § 36-8-1(2). A holder, in turn, is "a person obligated to hold for the account of, or deliver or pay to, the owner" any property subject to the Act. *Id.* § 36-8-1(6). The insurance companies do not dispute their status as holders for purposes of this appeal.

Whether specific property may be presumed abandoned is determined by resort to the Act. In the context of the dispute before us, section 2 of the Act provides:

> (a) Property is presumed abandoned if it is unclaimed by the apparent owner during the time set forth below for the particular property:
> . . . .
> (8) Amount owed by an insurer on a life or endowment insurance policy or an annuity that has matured or terminated, *three years after the obligation to pay arose* or, in the case of a policy or annuity payable upon proof of death, three years after the insured has attained, or would have attained if living, the limiting age under the mortality table on which the reserve is based[.]

*Id.* § 36-8-2(a), -2(a)(8) (1997) (emphasis added). With respect to the foregoing provision, the Treasurer's position is easily understood: an insurer's obligation to pay the beneficiary of a life insurance policy arises when the insured dies.[1]

---

[1] The quoted portion of the Act specifies that policy proceeds are alternatively payable if the insured survives to the limiting age, which, we are advised, is typically around age ninety-five. In light of the relative infrequency of the alternative triggering event, we make scant reference to it herein.

An insurer in possession of presumptively abandoned life insurance proceeds—like any holder of comparable property—must annually file a verified report with the Treasurer, which, inter alia, describes the property and provides the identity and last known address of the apparent owner. *See* W. Va. Code §§ 36-8-7 (1997). Within sixty to one hundred twenty days prior to filing the report, the insurer is required in most cases to attempt to notify the apparent owner in writing that he or she should claim the proceeds. *See id.* § 36-8-7(e). If the notification effort proves unsuccessful, the insurer shall (with certain exceptions not applicable here) turn over the proceeds to the Treasurer, *see id.* § 36-8-8(a), who then deposits them in the Unclaimed Property Fund, *see id.* § 36-8-13(b).

Between September 20, 2012, and December 28, 2012, the Treasurer filed sixty-nine substantially similar complaints in the circuit court against insurance companies, seeking to enforce the insurers' obligations under the Act to file reports and transfer presumptively abandoned life insurance proceeds. In those complaints, the Treasurer pertinently alleged that the United States Department of Commerce maintains a computerized database, known as the Death Master File ("DMF"), compiled from social security records.[2] Where the insurers have issued an annuity contract payable only

---

[2] For the purposes of this appeal of the circuit court's dismissal of the Treasurers' complaints pursuant to West Virginia Rule of Civil Procedure 12(b)(6), we accept as true the factual allegations of those complaints. *See infra* Part II.

3

during the lifetime of the annuitant, the Treasurer asserts that the DMF is regularly consulted to determine whether the annuitant has died and the contractual obligation has ended. With respect to the life insurance policies they issue, however, the Treasurer contends that the insurers do not avail themselves of the DMF or of any alternative data source to determine whether the insured has died with no claim to the proceeds having yet been filed by a beneficiary. Moreover, the Treasurer alleges that, in certain cases where premiums on whole life products are no longer remitted (or due) because the policyholder has died, the insurers, in the absence of a claim, siphon to exhaustion the underlying cash value in satisfaction of the phantom premiums on the fiction that the policyholder is perhaps alive and would not want the policy to lapse.

According to the Treasurer, because the insurance companies have declined to use the DMF to learn of the deaths of their insureds, they have "failed to truthfully report abandoned or unclaimed property," and have "paid into the Unclaimed Property Fund amounts less than actually due the State under the Act." The complaints thus demand a statutory audit, *see* West Virginia Code § 36-8-20(b) (1997), interest and civil penalties on proceeds thereby discovered to have been improperly withheld, *see id.* § 36-8-24, and injunctive relief compelling the insurers to implement policies and procedures to assist in facilitating their future compliance with the Act. The Treasurer also pursues an award of attorney fees. *See id.* § 36-8-22.

4

In sixty-three of the proceedings, the defendant insurance company moved for dismissal on the ground that the complaint failed to state a claim upon which relief could be granted. *See* W. Va. R. Civ. P. 12(b)(6). The circuit court conducted a hearing on the motions on September 6, 2013, and, on December 27, 2013, it entered an order granting them. In so ruling, the circuit court concluded that the Act should be construed *in pari materia* with the provisions of Article 13 of the Insurance Code, West Virginia Code §§ 33-13-1 to -48, and specifically Code section 33-13-14, which requires all life insurance policies delivered in the state to include "a provision that when a policy shall become a claim by the death of the insured[,] settlement shall be made upon receipt of due proof of death."

The circuit court thus reasoned that, until proof of an insured's death had been submitted to the insurer, no "obligation to pay" the proceeds of the insured's life insurance policy could arise within the meaning of the Act. Consequently, the insurer should be permitted to retain those proceeds until someone having a contractually derived interest makes a formal claim in accordance with the policy. On January 24, 2014, the Treasurer timely noticed his appeal of the circuit court's order.[3]

---

[3] The questions presented for resolution are the same with respect to all sixty-three named respondents, twenty-two of which have joined one of three representative briefs on appeal. Lead respondent Nationwide Life Insurance Company jointly submitted a

(continued . . .)

5

## II. STANDARD OF REVIEW

We review de novo the circuit court's grant of the respondents' motions to dismiss the complaints pursuant to Rule 12(b)(6) of the West Virginia Rules of Civil Procedure. *See* syl. pt. 2, *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 461 S.E.2d 516 (1995). In conducting our review, we construe the complaints in the light most favorable to the non-moving party, meaning that we accept as true the well-pleaded factual allegations therein and draw all reasonable inferences therefrom to the Treasurer's advantage. *See Conrad v. ARA Szabo*, 198 W. Va. 362, 369-70, 480 S.E.2d 801, 808-09 (1996) (citing *Murphy v. Smallridge*, 196 W. Va. 35, 36, 468 S.E.2d 167, 168 (1996)). We are not bound, however, to accept any party's posited

---

brief with Nationwide Life and Annuity Insurance Company. Monumental Life Insurance Company and Transamerica Life Insurance Company submitted their own joint brief. The third brief was submitted jointly on behalf of eighteen respondents, including New York Life Insurance Company; Lincoln National Life Insurance Company; Erie Family Life Insurance Company; New York Life Insurance and Annuity Corporation; The Western and Southern Life Insurance Company; Western-Southern Life Assurance Company; Primerica Life Insurance Company; Farm Family Life Insurance Company; Employees Life Company (Mutual); Ohio National Life Assurance Corporation; ReliaStar Life Insurance Company; Physicians Life Insurance Company; Horace Mann Life Insurance Company; Provident Life & Accident Insurance Company; Pacific Life Insurance Company; Colonial Life & Accident Insurance Company; American Family Life Insurance Company of Columbus, GA; and The Lafayette Life Insurance Company.

In support of the Treasurer, two *amici curiae* have filed briefs. We acknowledge the individual contributions of Xerox State & Local Solutions, Inc., d/b/a Xerox Unclaimed Property Clearinghouse, and of National Association of Unclaimed Property Administrators, each of which we thank for its assistance.

statutory interpretations or proffered conclusions of law. *See W. Va. Human Rights Comm'n v. Garretson*, 196 W. Va. 118, 123, 468 S.E.2d 733, 738 (1996). A complaint should not be deemed insufficient under Rule 12(b)(6) and thereby dismissed "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Syl. pt. 3, *Chapman v. Kane Transfer, Inc.*, 160 W. Va. 530, 236 S.E.2d 207 (1977) (citation omitted).

## III. ANALYSIS

As a threshold matter, courts may not regard separate and distinct statutes *in pari materia* unless the Legislature's intent is ambiguous with respect to the statute in question. *See State ex rel. Morrisey v. W. Va. Office of Disciplinary Counsel*, 234 W. Va. 238, 764 S.E.2d 769, 780 (2014) ("'[T]he rule that statutes which relate to the same subject should be read and construed together is a rule of statutory construction and does not apply to a statutory provision which is clear and unambiguous.'" (quoting syl. pt. 1, *State v. Epperly*, 135 W. Va. 877, 65 S.E.2d 488 (1951))). Here, the circuit court believed the Act to be ambiguous, thereby permitting it to look to Article 13 of the Insurance Code to discern the Legislature's intent in enacting the former. *See* syl. pt. 6, *Cmty. Antenna Serv., Inc. v. Charter Comm'ns VI, LLC*, 227 W. Va. 595, 712 S.E.2d 504 (2011) (instructing that separate and distinct statutes "'relat[ing] to the same persons or things, or to the same class of persons or things, or statutes which have a common purpose will be regarded *in pari materia* to assure recognition and implementation of the

7

legislative intent'" (quoting syl. pt. 5, *Fruehauf Corp. v. Huntington Moving & Storage Co.*, 159 W. Va. 14, 217 S.E.2d 907 (1975))).  With respect to the insurers' duties herein, the circuit court's construction of the Act *in pari materia* with the Insurance Code was appropriate only if the Act's relevant provisions are ambiguous.  If, however, the Act's relevant provisions are not ambiguous, the circuit court's resort to the Insurance Code was unnecessary and improper.

To ensure that we interpret the Act to accurately ascertain the insurers' duties in accordance with what the Legislature intended, we rely primarily on a crucial component of section 2—subsection (e)— that precisely sets forth the parameters of property presumed abandoned, confirming that such "[p]roperty is payable or distributable . . . *notwithstanding the owner's failure to make demand or present an instrument or document otherwise required to obtain payment.*"  W. Va. Code § 36-8-2(e) (1997) (emphasis added).  Section 2(e) is best understood as acknowledging and codifying the United States Supreme Court's decision in *Connecticut Mutual Life Insurance Co. v. Moore*, 333 U.S. 541 (1948).  At issue in *Moore* was New York's Abandoned Property Law, which, inter alia, required insurers to report and pay over to the state the proceeds of life insurance policies on which no claim had been made within seven years following the death of the insured.  The Supreme Court rejected constitutional challenges by a group of insurers that the required transfer to the state's abandoned property fund impaired their right to rely upon bargained-for claims

8

procedures set forth in their policies. The insurers argued that they had no obligation to pay anyone unless a proper claim was made, and that due process required the state to instead seek judicial authorization prior to any transfer of proceeds to the New York fund. In ruling against the insurers, the Supreme Court observed that the state, in taking custody of abandoned property, "is acting as a conservator, not as a party to a contract." *Id.* at 547. Thus, the Supreme Court reasoned, "it would be beyond a reasonable requirement to compel the state to comply with conditions that may be quite proper as between the contracting parties." *Id.*

Our reading of section 2(e)'s provenance in *Moore* is consistent with that of the drafters of the model Uniform Unclaimed Property Act. In the official commentary to section 2(e) published in connection with the model statute's 1995 iteration, which was subsequently enacted in West Virginia, the drafters explained that

> Subsection (e) [of section 2] is intended to make clear that property is reportable notwithstanding that the owner, who has lost or otherwise forgotten his or her entitlement to property, fails to present to the holder evidence of ownership or to make a demand for payment. *See Connecticut Mutual Life Insurance Co. v. Moore*, 333 U.S. 541 (1948).

National Conference of Commissioners on Uniform State Laws, Uniform Unclaimed Property Act, § 2 cmt. (1995). By this 1995 iteration, *Moore*'s general application to the law of unclaimed property had already been firmly established for at least fourteen years, that is, from the immediately preceding 1981 version of the model statute. The 1995 version of section 2(e) and its attendant commentary regarding *Moore* were reproduced

9

almost verbatim from the 1981 version. It is apparent that West Virginia's Legislature was fully aware of section 2(e)'s genesis in the *Moore* decision. Moreover, we note that the first inclusion of section 2(e) in the model uniform statute in 1981 came just one year after DMF records became publicly available.

The insurers would have us limit *Moore* to its facts. Indeed, insofar as the Supreme Court's review was confined solely to the constitutional validity of the New York statute, the circuit court expressed doubt that the principles set forth in *Moore* apply with equal force to matters of statutory construction decided exclusively pursuant to state law. We harbor no similar doubt and conclude that *Moore* bears squarely on the state law question we decide today. *Moore* applies necessarily through section 2(e) to any sort of property that might be presumed abandoned, including beyond doubt the life insurance proceeds at issue herein.

The plain wording of section 2(e), particularly in view of its heritage in *Moore*, flatly rebuffs the insurers' contention, accepted by the circuit court, that the "obligation to pay" the proceeds of a life insurance policy to the Treasurer cannot arise until a beneficiary perfects a claim thereupon. The insurers maintain that their "obligation to pay" under the Act can only be fully understood by considering it *in pari materia* with the Insurance Code's regulation of their contractual relationship with the policies' insureds. Therefore, the argument goes, no beneficiary can enjoy the proceeds

10

to which he or she is entitled without first filing a claim. The mere requirement of a claim in accordance with the Code, however, does not begin to address the wholly different question, decided in *Moore* and present here, regarding duties imposed on the insurers by a regulatory scheme separate and distinct from any obligation under an insurance contract.[4]

With respect to the presumptively abandoned proceeds of a life insurance policy, the plain language of section 2(e) of the West Virginia Uniform Unclaimed Property Act, West Virginia Code § 36-8-2(e) (1997), demonstrates the Legislature's

---

[4] Section 2(e) also informs an accurate construction of the term "property," defined by the Act as, inter alia, "a fixed and certain interest in intangible personal property that is held, issued or owed in the course of a holder's business." W. Va. Code § 36-8-1(13). The Act lists several examples of property, one of which is "[a]n amount due and payable under the terms of an annuity or insurance policy, including policies providing life insurance." *Id.* § 36-8-1(13)(vi). Construing the above-quoted excerpts of section 1(13) *in pari materia* with section 2(e) in order to ensure that each is given its proper force and effect, we have no trouble concluding that, for purposes of the Act, section 2(e) removes any doubt that a beneficiary's interest in the proceeds of a life insurance policy becomes sufficiently fixed and certain on the death of the insured and not when a claim is subsequently perfected. We need not decide whether such proceeds are also "due and payable" at death, inasmuch as the list of specific property in section 1(13) is merely illustrative and not intended to exclude unmentioned examples. *See Davis Mem'l Hosp. v. W. Va. State Tax Comm'r*, 222 W. Va. 677, 684, 671 S.E.2d 682 (2008) ("[T]his Court has recognized that the term "includes" in a statute is to be dealt with as a word of enlargement." (citation, alterations, and internal quotation marks omitted)). Put another way, if we assume for the sake of argument that no proceeds of life insurance policies are ever due and payable until a claim is perfected, such circumstance only confirms those proceeds' status under the Act as "property." It does not necessarily follow, particularly in consideration of the enactment of section 2(e), that such proceeds cannot sooner qualify as property subject to the Act.

11

intent to affirmatively separate the insurer's obligation to account for and pay those proceeds to the Treasurer from the filing of any claim for benefits required by the policy terms. The insurer's obligation to account for and pay those proceeds is tied instead to the death of the insured (or the insured's attainment of the limiting age), maturing three years thereafter.

Our conclusion arises inexorably from the Legislature's purposeful bifurcation of the insurer's obligations under the Act from those pursuant to the Code in section 2(e) of the former, and it is the only plausible alternative to the claim-filing trigger urged by the insurers. Because the Act in this regard admits of only one interpretation, it is not ambiguous; it was therefore error for the circuit court to construe the Act *in pari materia* with the inapposite provisions of the Insurance Code directed solely at the contractual relationship between insurer and insured, and not purporting in any manner to govern the conduct of the Treasurer in his role as conservator for the citizenry. The circuit court's ruling treating the provisions of the Insurance Code as controlling deprived the Act of its full force and effect, contrary to our precedent.[5]

---

[5] The circuit court's misperception that the two statutes should be construed together led it to conclude that the Legislature would have more specifically distanced the "obligation to pay" trigger under the Act from the "due proof of death" required for claims payment under the Insurance Code had it not intended for the latter to instruct as to the former. To the contrary, the two enactments govern entirely different situations, and we perceive the Act to be sufficiently specific and precise, particularly in view of the enlightenment provided by section 2(e).

The circuit court referred to recent unpublished decisions in three other states as consistent with its interpretation of West Virginia law. We do not find them persuasive. In two of those cases, the court merely ruled that, in the absence of a claim as required by contract, the defendant insurer had no independent duty to its insured or the insured's beneficiary to search the DMF. *See Feingold v. John Hancock Life Ins. Co. (USA)*, No. 13-10185, 2013 WL 4495126 (D. Mass. Aug. 19, 2013); *Andrews v. Nationwide Mut. Ins. Co.*, No. 97891, 2012 WL 5289946 (Ohio Ct. App. Oct. 25, 2012), *review denied* 135 Ohio St. 3d 1415 (Ohio 2013). Neither opinion addressed the broader obligation to state governments acting as conservators, established in *Moore* and codified in the Act.

The third case, *Total Asset Recovery Services, LLC v. MetLife, Inc.*, No. 2010-CA-3719, 2013 WL 4586450 (Fla. Cir. Ct. Aug. 20, 2013), was a qui tam action alleging fraud on the part of several defendant insurers, based primarily on their retention of unclaimed policy proceeds that might have been payable had they cross-referenced their insureds against the DMF. The court determined that it had no jurisdiction over the dispute with respect to at least one insurer, as its liability had previously been compromised through settlement with the state's Department of Financial Services ("DFS"). The court therefore dismissed the complaint with prejudice.

13

The court held in the alternative that dismissal was warranted inasmuch as the insurer had not knowingly avoided any legal obligation, such obligation being a prerequisite to liability under the Florida False Claims Act. No obligation had arisen, according to the court, because the state's unclaimed property law imposes no duty on insurers to search the DMF or other external databases. The pronouncement of the Circuit Court of Florida on that point was confirmed last year in *Thrivent Financial for Lutherans v. Department of Financial Services*, 145 So. 3d 178 (Fla. Dist. Ct. App. 2014). In *Thrivent*, the court of appeals reversed the declaration of the DFS that the state's Disposition of Unclaimed Property Act rendered the proceeds of life insurance policies due and payable on the death of the insured. Although the statute required that proceeds be established "due and payable" exclusively by resort to the insurer's records, the DFS determined that the law imposed upon insurers the duty to supplement its records by consulting sources such as the DMF. The *Thrivent* court disagreed, observing that "nothing in the plain language of [the Florida Act] imposes an affirmative duty on insurers to search these death records." *Id.* at 182.

Likewise, the West Virginia Uniform Unclaimed Property Act imposes no specific duty on insurers to search the Department of Commerce's Death Master File or any comparable data source. Rather, the Act simply requires insurers generally, as holders of property presumed abandoned, to account for and turn over that property to the Treasurer. We have determined that, in the case of life insurance policy proceeds, the

14

three-year dormancy period leading to the presumption of abandonment commences with the death of the insured. Each insurer is free to determine how it will investigate and discover whether its insureds are yet living. Depending on the insurer's resources and the volume of business done in West Virginia, it may find, for instance, that contacting its insureds directly or farming the task out to its agents may produce the desired results in the most economical and reliable fashion. On the other hand, an insurer may well choose to review the DMF as the best or most efficient way to perform its duties under the Act.[6]

It is thus largely irrelevant that, as asserted by the insurers, "[f]ive of the 15 states adopting the 1995 Model UPA in some form have also recently enacted DMF legislation," explicitly imposing a duty to search that database. A similar enactment in

---

[6] The insurers warn that the DMF is not infallible, in that "some deaths never show up" in the file, "and living individuals have been listed as dead." Nevertheless, if the Treasurer's complaints are to be believed, the insurers find the DMF reliable enough to support their efforts to cease payments on lifetime annuities. Several other practical considerations, according to the insurers, counsel against construing the Act in a manner requiring them to account for life insurance proceeds in the absence of a claim. Among those are worries that insurers will lose their right to contest payment in the event of suicide or murder-for-hire, fraud in the application, or lack of an insurable interest. In that vein, the insurers contend, a claim serves as notice to investigate and assess their liability. We expect, however, that in many cases—particularly involving policies that have been in force for years—the sudden cessation of premiums being paid will serve as sufficient notice to the insurers that the insured may have died, such that they ought to further investigate. The three years that must thereafter elapse prior to the required remittance to the Treasurer provides sufficient opportunity for an insurer to satisfy itself that the proceeds are properly payable. We imagine that, except for the sheer volume of instances, these situations will prove analogous to those now confronted by the insurers when an insured reaches the policy's limiting age, triggering payment though no claim has been filed.

15

West Virginia, as made evident by our holding today, would unnecessarily tread upon the insurers' prerogative to decide how they will comply with the Act. The insurers, however, persuaded the circuit court to surmise that "[s]uch legislation would be redundant or unnecessary if a duty to search already existed in the UPAs adopted by these states." *Cf. United Ins. Co. of Am. v. Commw. Dep't of Ins.*, No. 2013-CA-000612-MR, 2014 WL 3973160 (Ky. Ct. App. Aug. 15, 2014) (holding that duty to search DMF imposed by new model legislation applied only to policies issued after statute's effective date of January 1, 2013). Were we to assume, however, that the specific, nonexistent "duty to search" could stand as a proxy for the general "duty to comply" unquestionably extant in the Act, the circuit court's rationale is faulty. *See, e.g.*, *Childers v. Parker's, Inc.*, 162 S.E.2d 481, 484 (N.C. 1968) ("Whereas it is logical to conclude that an amendment to an unambiguous statute indicates the intent to change the law, no such inference arises when the legislature amends an ambiguous provision." (citing 1 Sutherland, Statutory Construction § 1930 (1968 Cum. Supp.))). It is apparent from the nationwide legislative reaction to the proliferation of settlements emanating from the insurers' conduct, *see infra* note 9, that our sister states have perceived an ambiguity in their own statutory schemes that they wish to clarify.

In the event that the insurer's chosen methodology proves lacking, the Act sets forth a comprehensive remedial scheme to encourage improvement. To begin with, "[a] holder who fails to report, pay or deliver property within the time prescribed" is

liable to the Treasurer for interest on the property at twelve percent annually. W. Va. Code § 36-8-24(a) (1997). In addition, "for each day the report, payment, or delivery is withheld," the Act prescribes a civil penalty of two hundred dollars per day, to a maximum of five thousand dollars. *Id.* § 36-8-24(b). The penalties for a willful violation of the Act rise to one thousand dollars per day, to a maximum of twenty-five thousand dollars, "plus twenty-five percent of the value of any property that should have been but was not reported." *Id.* § 36-8-24(c). The Treasurer has the authority to waive interest and penalties, and "shall waive penalties if the holder acted in good faith and without negligence." *Id.* § 36-8-24(e).[7]

---

[7] The Treasurer also invites our attention to section 10 of the Act. That section safeguards holders from transfers made in error, instructing that one "who pays or delivers property to the administrator in good faith is relieved of all liability arising thereafter with respect to the property." W. Va. Code § 36-8-10(b) (1997). An insurer acts in good faith for purposes of section 10 if its payment constituted a reasonable attempt to comply with the Act, *see id.* § 36-8-10(a)(1), if it harbored a reasonable belief that the property was abandoned and it was not otherwise in breach of a fiduciary obligation owed the property owner, *see id.* § 36-8-10(a)(2), and if "[t]here is no showing that the records under which the payment or delivery was made did not meet reasonable commercial standards of practice," *id.* § 36-8-10(a)(3). The Treasurer contends that the good-faith and reasonableness requirements of section 10 should be extrapolated generally to the Act to impose a duty upon the insurers to proactively use the DMF to comply with their reporting and transfer obligations. We decline the Treasurer's invitation to interpret the Act in such a manner, as section 10 pointedly targets transfers that have actually been made, in no way purporting to govern transfers that potentially should be made. Moreover, as we have concluded *supra*, insurers are charged with no specific duty under the Act to consult the DMF.

The insurers' alleged failure to report, pay, and deliver property is at the heart of the Treasurer's complaints in this matter. On remand, after the insurers have been afforded the opportunity to answer the complaints, the circuit court shall permit the Treasurer to exercise his statutory right to examine the insurers' records for compliance with the Act. *See* W. Va. Code § 36-8-20(b).[8] If, at the close of discovery and after any dispositive motions, one or more genuine issues remain with respect to the insurers' conduct, *e.g.*, whether they have complied with the Act, and if not, whether such noncompliance was willful or instead an inadvertent misstep taken in good faith and without negligence, then we expect the circuit court to resolve those issues through rigorously reasoned findings of fact and conclusions of law.[9]

---

[8] The Treasurer need not institute litigation to exercise his right to the examination provided for in section 20(b), such examination or audit being subject merely to reasonable notice and conduct at a reasonable time. Given that the question arises in the context of litigation, however, we should note that the bounds of discovery are not necessarily the same as the Treasurer's section 20(b) examination, and that the circuit court may exercise its sound discretion to permit additional relevant discovery on the part of any party, including the Treasurer. Because the circuit court's dismissal order is reversed and full discovery will be conducted on remand, we do not address the Treasurer's alternative argument that preliminary discovery was required before the circuit court could properly dismiss the complaints.

[9] There are, we suppose, myriad ways for a holder to show that it has acted in good faith and without negligence. The circuit court may wish to consider, for instance, whether the insurers have acted in accordance with standards of commercial reasonableness. In the conduct of such an analysis, it may be relevant whether the insurers, as alleged, have frequently resorted to the DMF to terminate their annuity liabilities. Another item that may be worthy of evaluation is whether and when the insurers have settled claims in other jurisdictions that have the same or similar unclaimed property scheme as West Virginia. In that regard, we are under the impression that John

(continued . . .)

## IV. CONCLUSION

Pursuant to the foregoing, we reverse the circuit court's dismissal order of December 27, 2013, and we remand these matters for further proceedings consistent with this opinion.

Reversed and remanded.

---

Hancock entered into a Global Resolution Agreement in 2011 "with a list of states that now totals at least thirty-five." Devin Hartley, Note, *A Billion Dollar Problem: The Insurance Industry's Widespread Failure to Escheat Unclaimed Death Benefits to the States*, 19 Conn. Ins. L.J. 363, 391 (2013). We are led to believe that Nationwide, Prudential, MetLife, AIG, and Lincoln Financial executed like agreements with varying numbers of states in 2012. *See id.* at 391-92. It is said that the aggregate of these settlements totals hundreds of millions of dollars, and, if so, one may conclude from the gross conspicuousness of the disputes and their resolution that the insurers have been on notice for some time that similar, meritorious claims are likely present here in West Virginia. *Cf. Estate of Bailey*, 554 N.Y.S. 791, 793 (N.Y. Surr. Ct. 1990) (observing that executor of estate could not avail himself of good-faith defense to liability for recovery of Medicaid benefits paid on behalf of decedent where executor took "ostrich approach to the existence of creditors").